**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————x

AF TRUCKING INC d/b/a AF TRUCKING, and
YIDA FALKOWITZ,

                  Plaintiffs,

  - against -                         **7:19-cv-08149-CS**

BUSINESS FINANCIAL SERVICES, INC. d/b/a
BFS CAPITAL and AXOS BANK,

                  Defendant.

————————————————————x

## MEMORANDUM IN OPPOSITION OF DEFENDANTS MOTION TO COMPEL AND IN SUPPORT OF PLAINTIFFS MOTION TO REMAND OR IN THE ALTERNATIVE GRANTING SUMMARY JUDGMENT

Plaintiffs, AF Trucking, Inc., d/b/a/ AF Trucking and Yida Falkowitz (collectively, "Plaintiffs"), by and through their undersigned counsel, file this Memorandum in Support of Motion to Remand or in the Alternative a Motion for Summary Judgment and states as follows:

I am an associate with Levenson Law, attorneys of record for plaintiffs, AF TRUCKING d/b/a AF TRUCKING ("AF Trucking") and YIDA FALKOWITZ (collectively, "Plaintiffs"), and, as such, I am fully familiar with the facts and circumstances herein based upon a review of the file maintained by this office. I submit this affirmation in support Plaintiffs' motion for an Order:

    a)  Denying Defendants motion to compel arbitration.

    b)  granting Plaintiff's summary judgment against Defendant pursuant to CPLR § 3212;

    c)  granting all claims and causes of action against Defendant and directing the clerk of the court to enter judgment accordingly; and

d) for such other and further relief as this Court may deem just and proper.

The admissible proof submitted in support of the instant motion establishes that Defendant was knowingly reaping usurious gains from a loan with an interest rate that exceeds 25% disguised as a purported purchase of accounts receivable/Factoring Agreement , i.e. "Merchant Agreement," and as such, is subject to Penal Law §§ 190.40 and 190.42, and General Obligations Law §§ 5-501, 5-511.

## PROCEDURAL HISTORY

On **April 11th, 2019**, Plaintiffs' filed a lawsuit against Defendants, Business Financial Services, Inc., d/b/a BFS Capital ("BFS") and Axos Bank ("Axos") (collectively "Defendants") in the Supreme Court of the State of New York, Orange County, Index No. EF002854-2019 (the "State Court Action").

1.    Defendants admit in their Notice of Removal that they were both served with a Summons and Complaint in the State Court Action on July 31, 2019.

2.    On August 15, 2019, Defendants moved the State Court for an Order to Show Cause.  According to the Motion to Remand, the State Court signed the Order to Show Cause ("OSC") and ordered the parties to appear for a conference on August 26, 2019.

3.    According to the Motion to Remand, the State Court failed to provide the Defendants notice of the August 26, 2019 Conference[1] and improperly alleged that the Plaintiffs appeared *ex parte*. At the Conference, the State Court set forth a briefing schedule on the OSC requiring Plaintiffs' opposition be due on September 26, 2019 and Defendants' reply would be due on October 10, 2019.

---

[1] And attempts to infer that the Plaintiffs had some duty to notice Defendants of the State Court Conference on the Defendants OSC.

4.      In what clearly appears to be Defendants' dismay with the State Court's proceedings and failure to notice Defendants with respect to the OSC, the Defendants filed a "Notice of Removal" with this Court.

5.      A Note of Issue has not been filed in this matter. Therefore, the instant motion is timely.

6.      No prior request has been made for the relief requested herein.

## FACTUAL BACKGROUND

7.  Plaintiff and Defendants entered into a Merchant Agreement on or about March 7, 2019 and attached hereto as Exhibit "A.".

8.  On page 3 and attached hereto separately as Exhibit "B." Plaintiff agreement is titled "Secured Promissory Note" ("SPN").

9.  The Agreement provides the loans as follows: Principal Amount: $70,100.00; Repayment Amount: $98,841.00; Processing Fee: $475.00; Origination Fee $1,051.50; Payment Frequency: Daily; Payment Amount: $393.00; **Factor Rate: 1.41.**

10. Defendants' have demanded payment in full according to the terms of the Agreement from the Plaintiffs.

11. Plaintiff has made said payments up and until its decision to file this Complaint.

## MOTION TO REMAND – FORUM/JUDGE SHOPPING

12.     On April 11th, 2019, Plaintiffs' filed a lawsuit against Defendants, Business Financial Services, Inc., d/b/a BFS Capital ("BFS") and Axos Bank ("Axos") (collectively "Defendants") in the Supreme Court of the State of New York, Orange County, Index No. EF002854-2019 (the "State Court Action").

13.     Defendants admit in their Notice of Removal that they were both served with a Summons and Complaint in the State Court Action on July 31, 2019.

14.     On August 15, 2019, Defendants moved the State Court for an Order to Show Cause.  According to the Motion to Remand, the State Court signed the Order to Show Cause ("OSC") and ordered the parties to appear for a conference on August 26, 2019.

15.     According to the Motion to Remand, the State Court failed to provide the Defendants notice of the August 26, 2019 Conference[2] and improperly alleged that the Plaintiffs appeared *ex parte*. At the Conference, the State Court set forth a briefing schedule on the OSC requiring Plaintiffs' opposition be due on September 26, 2019 and Defendants' reply would be due on October 10, 2019.

16.     In what clearly appears to be Defendants' dismay with the State Court's proceedings and failure to notice Defendants with respect to the OSC, the Defendants filed a "Notice of Removal" with this Court.

17.     Plaintiffs would suggest that Defendants were forum shopping by filing their Notice of Removal.

18.     The Defendants Notice of Removal is based upon Diversity Jurisdiction pursuant to 28 U.S. Code § 1332.

19.     Defendants filed a "Rule 7.1 Corporate Disclosure Statement" with this Court which provides in part that "Axos Bank is not a publicly traded company.  It is wholly owned by its parent corporation Axis Financial, Inc., a publicly-traded company."

20.     Defendant Axos Banks website states that "Axos Bank is FDIC-insured and our holding company, Axos Financial, is publicly traded on the New York Stock Exchange

---

[2] And attempts to infer that the Plaintiffs had some duty to notice Defendants of the State Court Conference on the Defendants OSC.

under the symbol "AX". We are headquartered in San Diego, California, with offices in Laguna Hills, California; Los Angeles, California; Overland Park, Kansas; Omaha, Nebraska; Las Vegas, Nevada; **New York, New York**; Columbus, Ohio; Salt Lake City, Utah; and more coming soon."  (See https://www.axosbank.com/About-Us) (Emphasis added)

21.     "As has long been settled, and as we reaffirm today, a state court may exercise personal jurisdiction over a nonresident defendant only so long as there exist "minimum contacts" between the defendant and the forum State. *International Shoe Co. v. Washington, supra,* at 316. The concept of minimum contacts, in turn, can be seen to perform two related, but distinguishable, functions. It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *World-Wide Volkswagen Corp. v. Woodson*, 444 US 286, 291-292 (S. Ct. 1980)

22.     The U.S. Supreme Court has repeatedly recognized the general goal of preventing forum shopping.  See *Hill v. Delta Intern. Machinery Corp.*, 386 F. Supp. 2nd 427, 431 (S.D.N.Y. 2005)

23.     "The irony of the parties' respective positions, when viewed in conjunction with the rulings issued from both courts, leads the Court to only one conclusion -- Williams, Cinram and Target are seeking to engage in forum shopping. Target wants the case to remain here because this Court has previously issued a preliminary injunction ruling favorable to it, whereas Williams and Cinram want the action transferred to California where Target has received unfavorable rulings. "The purpose of § 1404(a) is not to allow judge-shopping by litigants." Betts v. Atwood Equity Co-op. Exchange, Inc., No. 88-4292-R, 1990 U.S. Dist. LEXIS 8132, 1990 WL 92495, at *1 (D. Kan. Jun. 13, 1990). While the motion is being made

under the pretense that it is more convenient for the moving parties, the true motivation behind it is 'judge-shopping.' " (*Williams Advanced Materials, Inc. v Target Tech. Co., LLC*, 2007 US Dist LEXIS 56189, at *16 [WDNY Aug. 1, 2007, No. 03-CV-276-A])

24.     It is quite apparent that the Defendants chose to remove the instant matter to this Court solely due to their displeasure with the State Court Judge.

## MOTION FOR SUMMARY JUDGMENT
## SUMMARY OF ARGUMENT

25.     The Court should grant Plaintiffs' summary judgment motion as there is no triable issue of material fact to be determined by a jury as to the usury of the disguised loan and its over 25% interest rate. Rather, the admissible evidence shows that Defendantknowingly obtained usurious gains through its loan disguised as a purchase agreement for Plaintiffs' accounts receivable/Factoring Agreement .

26.     The Agreement entered into is without a doubt a usurious loan by: 1) its agreement terms evidencing the intention of a loan; 2) its "Specific Daily Amount" repayment obligations and lack of reconciliation provision; 3) Defendant absolute right to repayment; 4) the finite payment period; 5) the unconditional guaranty; and 5) its excessive interest rate exceeding twenty-five percent (25%) per year. As evinced by the following, the Agreement must be deemed void *ab initio*.

## ARGUMENT

## ARBITRATION IS NOT APPROPRIATE UNTIL AFTER THE TRIAL COURT DETERMINES WHETHER THE WRITTEN AGREEMENTS IN THIS MATTER ARE USURIOUS

27.     In *Durst v. Abrash*, 22 A.D.2d 39, 41 (1st Dept. 1964), *Affd*, 17 NY2d 445 (1965), the Court stated that "As for the form of the agreement, it is undisputed law that a usurious agreement is invalid regardless of the form it takes and regardless of the rules

governing integrated agreements. It is always possible to show that any transaction and the documents which are a part of it are illegal and unenforceable as a usurious transaction. (Restatement, Contracts, § 229, *Comment b*; § 529; cf. *Hartley v. Eagle Ins. Co.*, 222 N.Y. 178, 184-185; *Thurston v. Cornell*, 38 N.Y. 281, 285.) In such an inquiry the issue is not the interpretation of the language used but what are the facts behind the facade of language."

28.     The *Durst* Court affirmed the trial court's "order denying defendant's motion to compel arbitration pending a trial of the issues of whether the written agreements are usurious and invalid." *Id.*, 22 A.D.2d, at 44.

29.     In U.S. v. Stein, 452 F. Supp. 2d 230, 259-60 (S.D.N.Y. 2006), the Court held that [The public interests at issue here are at least as important as those at issue in *DeGaetano, Board of Education of Buffalo,* and similar cases.[115] Accordingly, the Court holds that any arbitration clause that otherwise would require arbitration of claims for advancement of defense costs in this pending criminal case is, to that extent, void as against public policy." Footnote 115 states "*See also Durst v. Abrash,* 22 A.D.2d 39, 43-44, 253 N.Y.S.2d 351, 354 (1st Dept.1964) (arbitration clause in usurious agreement unenforceable as against public policy), *aff'd on opinion below,* 17 N.Y.2d 445, 266 N.Y.S.2d 806, 213 N.E.2d 887 (1965)."


### PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT AS DEFENDANT PROVIDED A USURIOUS LOAN IN DISGUISE IN ORDER TO UNLAWFULLY COLLECT EXTORTIVE GAINS

### Applicable Law

30.     "A federal district court sitting in diversity generally applies the state law, including that state's conflicts laws, of the state in which it sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941)." *Lombard v. Economic Dev.*

*Admin.*, 1995 U.S. Dist. LEXIS 10518 (S.D.N.Y. 1995)

31.     "Since jurisdiction in the court below was based on diversity of citizenship, it was bound to apply the substantive law of New York, *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938), including the applicable New York conflict of laws rules, *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941)" *Stafford v. International Harvester Co.*, 668 F.2d 142, 147 (2d Cir. 1981) "The federal courts, when applying state law in their exercise of diversity jurisdiction, sit as another court of the state. *Guaranty Trust Co. v. York*, 326 U.S. at 108, 65 S. Ct. at 1469." *Id*.

32.     Therefore, in the instant matter, this Court should apply the substantive law of the State of New York.

33.     Pursuant to Fed. R. Civ. P. 56 "[A] party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970). When a court is confronted with facts that permit several different conclusions, all inferences from the underlying facts must be drawn in the nonmovant's favor. *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995). The trial court must bear in mind that "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)." *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 521 (2d Cir. 1996)

34.     "If the movant demonstrates an absence of material issues of fact, a limited burden of production shifts to the non-movant, which must 'demonstrate more than 'some metaphysical doubt as to the material facts, . . . [and] must come forward with "specific facts showing that there is a genuine issue for trial.' *Aslanidis v. United States Lines, Inc.*, 7 F.3d

1067, 1072 (2d Cir. 1993) (citations and emphasis omitted). Summary Judgment, then is granted only when 'there is an absence of evidence to support the nonmoving party's case,' _Celotex Corp v. Catrett_, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986), or, in other words, only if 'no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight.' _Gallo v. Prudential Residential Servs._, 22 F.3d 1219, 1224 (2d Cir. 1994). The trial court's task is 'carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.' _Id._" _B.F. Goodrich_, 99 F.3d, at 521-22.

35.    Applying the aforementioned principles to the case at bar, it is evident that Plaintiffs have adequately established the absence of material issues of fact. As a matter of law, the Agreement entered into between Plaintiffs and Defendant was a loan on its face, and further was usurious in nature. As such, Plaintiffs are entitled to summary judgment.

## 1.   **The "Factoring Agreement" is a Loan On its Face**

### a.   _Agreement was Intended to Function as a Loan_

36.    "In order for a transaction to constitute a loan, there must be a borrower and a lender; and it must appear that the real purpose of the transaction was, on the one side, to lend money at usurious terms dictated by the lender." _Donatelli v. Siskind_, 170 A.D.2d 433 (2d Dep't 1991).

37.    However, the title of an agreement is not dispositive of its terms. "[F]or the circumstance of a man's money remaining in another's hands, in consequence of an agreement for that purpose, will constitute a loan (Cowp. 113)." _London v. Toney_, 263 NY 439, 443

(1934). "[T]he forbearance, or giving time of payment for a debt, is in substance a loan." Id.

38.     "Denominating a loan document by another name, as in this case, by calling it a Merchant Agreement or Factoring Agreement, does not shield it from the judicial determination that is contemplates a criminally usurious transaction, which is void ab initio as a matter of law." Merchant Funding Servs., LLC v Volunteer Pharm. Inc., 55 Misc. 3d 316 (Sup Ct, Westchester County 2016); see also Pearl Capital Rivis Ventures, LLC v. RDN Const., Inc., 54 Misc. 3d 470. Ultimately, "[t]he question is whether a particular transaction under scrutiny 'was made in good faith and not as a cover for a loan.'" Pearl Capital, 54 Misc. at 474 (quoting 72 Am. Jur. 2d, Interest and Usury, § 85).

39.     The Agreement at issue here operated exactly like a loan made to the individual Plaintiff. In exchange for a principal loan amount less a loan "origination fee" and other service fees— AF Trucking was required to repay in fixed daily installments.

40.     The "Agreement" nowhere states an interest rate, nor does it refer to a principal amount loaned or to a repayment amount. Rather, because the Agreement purports to be purchases of accounts receivable/Factoring Agreement /Factor, the principal amount borrowed from the lender is called the "Principal Amount" which  must then be repaid, plus usurious interest to Defendants over a finite number of months on a daily basis.

41.     There is nothing in the Agreement that suggests that Defendant intended to be an investor or partner in AF Trucking's business nor that they sought to identify the accounts receivable/Factoring Agreement  that they were purportedly "purchasing." Merchant Funding Servs., LLC v Volunteer Pharm. Inc., 55 Misc. 3d 316 (Sup Ct, Westchester County 2016). In fact, Defendant did not identify, request, or receive any of the accounts receivable/Factoring Agreement  they were "purchasing", nor did it review customer credit reports or financial

-10-

information. Instead, mimicking a loan, the Plaintiffs collected the receivables and merely paid Defendant a money payment.

42.     A lender in a true accounts receivable/Factoring Agreement  transaction would want information about specific receivables purchased and the underlying obligors to vet its risk—here, Defendant took no such actions. In reality, Defendant does not have any department which reviews receivables other than plaintiffs' bank statements.

43.     Further, after the repayment of the Loan the parties' business relationship would terminate—exactly like the life cycle of a loan.

44.     The security agreement provides that once it is triggered by a default, the receivable balance would be accelerated—a true purchase of a future receivable cannot be accelerated. This is the language of a loan.

45.     The guaranty executed also refers to the lender's right to renew, extend, or otherwise modify the Agreement. However, a sale is a one-time event, whereas modification and renewal language may only reasonably refer to a loan.

46.     Here, although the agreement between the parties was labeled an "Agreement for the Purchase and Sale of Future Receipts," it contained the hallmarks of a loan agreement.

### b. *Fixed Daily Payments with No Reconciliation Provision*

47.     Just like a loan, the Agreement provides for repayment in fixed sums and intervals. Although the Agreement makes reference to a "Factor Rate of 1.41 suggesting that repayment obligations would be tied to the amount of its receipts each day. Its intentional purpose is to fool a borrower into believing such term is an interest rate. The repayment time frame under the Agreement instead is governed by the "Daily Amount." This amount must be

paid until Defendant receives repayment in full

Defendant has not once exercised the so-called "reconciliation" provision, and, moreover, Plaintiff has no recourse for their failure to do so. As such, Plaintiff is without any remedies to limit Defendant daily withdrawal regardless of what its actual receipts reflect. There is no term that sets forth the grounds upon which Defendant must reconcile nor a term which allows for Plaintiff to enforce or request such act.

48.      If the Agreement were really a Factoring Agreement of AF Trucking's future receipts, then there would be a permitted and enforceable reconciliation provision that would permit either party to review prior payments against actual receipts and reconcile them as to equate to the Factoring Rate  of those verified receipts. This kind of reconciliation provision is one of the principal factors courts look to in determining whether a merchant cash advance agreement is really a disguised loan. *See* K9 Bytes, Inc. v. Arch Capital Funding, LLC, 56 Misc. 3d 807 (Sup. Ct. Westchester Cnty. 2017) (holding that a reconciliation provision is one that would "reconcile…the account by either crediting or debiting the difference between the amount debited and the Factoring Rate , from or back to the Merchant's bank, so that the amount debited from each month equals the Factoring Rate ."). Prof'l Merch. Advance Capital, LLC v. C Care Servs., LLC, No. 13-CV-6562 RJS, 2015 WL 4392081, at *4 (S.D.N.Y. July 15, 2015) (ordering supplemental  briefing on damages because purchase agreement "which obligates [plaintiff] to make a minimum weekly payment irrespective of [borrower's]   accounts receivable/Factoring Agreement " was arguably a loan).

49.      While there is a provision masquerading with a title as such, there is no such working provision in the Agreement at hand. Simply put, at the end of each month, if AF Trucking had paid Defendant far more than 1.41 of its gross receipts, if had no

ability through the Agreement to recover those overpayments.

### c. *Absolute Repayment*

50.     "Further, there can be no usury unless the principal sum is repayable absolutely." Trustmedia Rest. Co. v. 33 E. 61ˢᵗ Rest. Corp., 184 Misc. 2d 706, 711 (Sup. Ct., N.Y. Cnty. 2000). "If [the principal sum] is payable upon some contingency that may not happen, and that really exposes the lender to a hazard of losing the sum advanced, then the reservation of more than legal interest will not render the transaction usurious, in the absence of a showing that the risk was assumed was so unsubstantial as to bear no reasonable relation to the amount charged. This risk of loss is to be distinguished from the risk of nonpayment that is inherent in every loan and that may only be compensated for by statutory interest." Merch. Funding, 55 Misc. 3d at 321 (*quoting* 72 N.Y. Jur. 2d Interest and Usury, § 87) (emphasis added).

51.     Although the Agreement *purports* to leave Defendant without recourse in the event that Plaintiffs' future receipts have slowed down, if AF Trucking has gone bankrupt, or has otherwise ceased operations, and only giving Defendant recourse to Plaintiffs' assets in the event of a default, the reality is (by the language of the Agreement) that  if AF Trucking's receipts decline, Plaintiffs necessarily go into default thereby assuring Defendant absolute repayment. ("If any Event of Default occurs…The full uncollected Purchased Amount plus all fees and charges (including legal fees) due under this Agreement will become due and payable in full immediately.") ("Seller understands that it is responsible for either ensuring that the Daily Amount is available in the Account each business day…").

52.     Put simply, if AF Trucking's business is slowed, and its receipts waned, then it

would still be contractually required to maintain a sufficient bank account balance to meet Defendant daily withdrawals. Defendant, at its sole discretion, could adjust the daily withdrawals, but there is no provision in the Agreement that requires them to do so. Likewise, there is no provision which permits Plaintiffs to demand the return of any overpayment in excess of the Factoring Rate . In fact, before AF Trucking could even declare bankruptcy, it would be in default under the Agreement.

53.     Defendant also grants itself the right to investigate Plaintiffs' financial responsibility and history at any time. However, were it truly a purchase of accounts receivable/Factoring Agreement /Factoring Agreement, Defendant would be concerned with the underlying customers' financial history—not plaintiffs'—because those entities are the source of the payment. The Agreement never concerns customer account debtors because Plaintiffs must make the repayment absolutely and this is secured by Plaintiffs' assets and personal guaranty.

54.     Further, upon default, the Agreement provides that the entire repayment amount would become due in full. At that time, Defendant would also be able to prosecute the personal guaranty and all of its security interests obtained through the Agreement.

55.     Because the purchased amount is repayable absolutely, Defendant bears absolutely no more risk than in that of a typical loan agreement.

### d. *Finite Payment Term*

56.     "The next provision that is deemed quintessential is whether the agreement has a finite term or not. If the term is indefinite, then it "is consistent with the contingent nature of each and every collection of future sales proceeds under the contract.'" K9 Bytes, Inc., 56 Misc. 3d at 817 (*quoting* IBIS Capital Group, LLC v. Four Paws Orlando LLC, 2017 NY Slip Op

30477[U] (Sup. Ct, Nassau County 2017)).

57.     The Agreement at issue provides for a set and finite, fixed daily payment. As mentioned above, if AF Trucking's business slowed and it was unable to pay the daily amount, AF Trucking is without remedy to reconcile or modify the payments, *i.e.* the Factoring Rate does not actually reflect the accounts receivable/Factoring Agreement each day. As shown by AF Trucking's accounting, Defendant has not once reconciled the payments but instead, have withdrawn the same daily amount continuously creating a finite period of payment.

58.     Further, page 19 of the Agreement contains a prepay clause. Prepayment clauses are consistent with terms of loans, and this provision adds another finite period of repayment for the lender.

59.     The existence of this certainty of payment is an express factor in the difference between a proper agreement for accounts receivable/Factoring Agreement and a loan. The finite period articulated in the Agreement at issue is consistent with that of a loan.

*e. Unconditional Guaranty*

60.     Notably, "the giving of a guaranty is one of the factors 'to be considered in determining whether the transaction is in fact a loan or purchase and sale." Merch. Funding, 55 Misc. 3d at 321 (*quoting* 72 N.Y. Jur. 2d Interest and Usury, § 87); *see also* Pearl Capital, 54 Misc. 3d at 471 (holding that any increased risk presented by the fact that lender was limited to debtor's accounts receivable/Factoring Agreement s for repayment was eliminated by lender securing a guarantee from debtor's principal). Here, the parties' Agreement removed all risk or contingency of nonpayment from Defendant.

61.     Endico Potatoes v. CIT Group/Factoring, 67 F.3d 1063, 1069 (1995):

> "Where the lender has purchased the accounts receivable/Factoring Agreement , the borrower's debt is extinguished and the lender's risk with

> regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor. **If the lender holds only a security interest**, however, the lender's risk is derivative or secondary, that is, **the borrower remains liable for the debt and bears the risk of non-payment by the account debtor**, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to satisfy the loan."

(emphasis added); In re O.P.M. Leasing Services, Inc., 30 B.R. 642, 648 (Bankr. S.D.N.Y. 1983) (holding that regardless of the terms used, because the credit company had recourse by personal guaranty, "the true nature of the transaction was that of a secured loan"); *see also* Home Bond Co. v. McChesney, 239 U.S. 568 (1916). Clearly, the parties' Agreement did not intend to extinguish Plaintiffs' obligation to make the fixed daily payments by Defendant acquiring any receivables of Plaintiffs'.

62.     In connection with the Agreement, Defendant required that Falkowitz supply a personal guaranty that "irrevocably, absolutely, and unconditionally guarantees to Buyer prompt and complete performance of all Seller's obligations under the Purchase Agreement." This guaranty was "unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Seller and Buyer, or the existence of any defense, setoff or counterclaim which Seller may assert." *Exhibit "A."*

63.     Again, were the Agreement truly a sale of accounts receivable/Factoring Agreement (title transfer in exchange for money), there would be no need for a personal guaranty—Defendant would gain title to the items purchased and the transaction would be concluded. Defendant then would move on, independent of Plaintiffs, by collecting the receivables from the debtor-customers, and bearing the risk of loss in the event of nonpayment. Instead, here, AF Trucking still collects the receivables and cash repayment from it is due to Defendant plus usurious interest.

64.     Guaranties exist with a loan only. Pursuant to the Agreement, in conjunction with the guaranty executed here, the guaranty will be invoked when a default occurs, and subsequently, the full Purchased Amount will become "payable in full." Payments are actions taken to repay a loan. The sale of a receivable is not a "payment."

65.     The personal guaranty ensured that if Defendant was unable to obtain its Daily Amount from AF Trucking, regardless of how much AF Trucking was actually receiving in revenue in a given month, Defendant could look to Falkowitz to make up the difference. In the end, these cloaked loan terms and guaranty made certain that the principal sum lent to AF Trucking, together with an obscene calculated interest, was absolutely repayable to Defendant.

**2. The Loan Contemplated by the Agreement is Criminally Usurious Pursuant to Penal Law § 190.40 and 190.42**

66.     "[C]orporations, generally the antithesis of 'desperately poor people,' are ordinarily barred from asserting a usury defense." Funding Grp., Inc. v. Water Chef, Inc., 19 Misc. 3d 483, 852 N.Y.S.2d 736, 740 (Sup. Ct. 2008). "Nevertheless, the criminal usury statute, unlike the civil statute barring loans of interest exceeding 16 percent, does apply to loans made to corporations." Hillair Capital Invs., L.P. v Integrated Frgt. Corp., 963 F. Supp. 2d 336 (SDNY 2013) (holding that it's appropriate to consider usury when loans are personally guaranteed by executives); Transmedia Restaurant Co., Inc. v. 33 E. 61st Street Restaurant Corp., 184 Misc. 2d 706, 710 (Sup. Ct., NY County 2000) ("although a corporation is generally prohibited from interposing the defense of usury in an action…this prohibition is not applicable to any action, such as the instant one, where the corporation interposes a defense of *criminal* usury") (emphasis added); *see* N.Y. Gen. Oblig. Law § 5-521(3). "Usury is an affirmative

defense and a heavy burden rests upon the party seeking to impeach a transaction for usury."
Gandy Mach., Inc. v. Pogue, 106 A.D.2d 684, 685 (N.Y. App. Div. 1984) (citations omitted).

67.     New York Penal Law § 190.40 and 190.42 prohibit loans with interest exceeding twenty-five percent (25%) per year. Violating those proscriptions are class E and C felonies, respectively.

68.     "The first element requires proof of the general intent to charge a rate in excess of the legal rate rather than the specific intent to violate the usury statute. Accordingly, the borrower satisfies his prima facie burden of proving usury by showing that the note given to the lender evidences a loan and reserves an illegal rate of interest. If usury is proved, the loan is deemed void, and the lender sacrifices his principal and interest." Merch. Funding, 55 Misc. 3d at 320; see also General Obligations Law § 50511(2).

69.     Whether an agreement fatally suffered from usury is a matter of interpreting the agreement within its four corners. Freita v. Geddes S& L Ass'n, 63 N.Y.2d 254, 262 (1984):

> It has been properly observed: '[If] the note or bond shows a rate of interest higher than the statutory lawful rate, it would be immaterial whether the lender actually intended to violate the law. His intent would be conclusively presumed.' (internal citations omitted).

70.     With respect to any loan or forbearance other than certain residential mortgage loans, the term 'interest,' for purposes of New York's civil and criminal usury statutes, "mean[s] all amounts paid or payable, directly or indirectly, by any person, to or for the account of the lender which would be includible as interest under New York law as it existed prior to the enactment of [section 14-a of the New York Banking Law,] chapter 349 of the Laws of 1968." 3 N.Y.C.R.R. § 4.2(b); see N.Y. Gen. Oblig. Law § 5-501(2).

71.     Although the Agreement contemplates that payments would be made by daily withdrawals of 50% of AF Trucking's receipts until the final sum was paid, the Agreement

specifically authorizes Defendant to make daily withdrawals. Because the Agreement assumes about 286 business days per year, this would result in annual rate above 80%. This would mean interest exceeding 80%. The Agreement is thus criminally usurious on its face and therefore void as a matter of law.

72.     Here, the plaintiff's complete written agreement with the defendants is inescapably a loan at a usurious rate of interest violating the 25% annual limit of Penal Law § 190.40 and 190.42.

73.     "When a court deems a transaction to be usurious, it must declare the transaction and its supporting documents void, enjoin prosecution on them and order that all documents and collateral be cancelled and surrendered." Szerdahelyi v. Harris, 67 NY 2d 42, 50-51 (1986).

74.     Defendant's in the business of making and collecting usurious loans. By structuring these usurious loans and attempting to collect on them, Defendant's engaging in interstate commerce. Defendant understands the Penal Law's usury proscriptions and, to avoid same, is in the business of knowingly reaping usurious gains from loans disguised as a purported purchase of accounts receivable/Factoring Agreement .

75.     As such, Defendant must not be able to "recover either the money loaned or the interest remaining due in this transaction." Id.

76.     12 U.S. Code § 85 provides in part that "Any association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State, Territory, or District where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and no more . . ."

77.     12 U.S. Code § 86 titled "Usurious interest; penalty for taking; limitations" provides that "The taking, receiving, reserving, or charging a rate of interest greater than is allowed by section 85 of this title, when knowingly done, shall be deemed a forfeiture of the entire interest which the note, bill, or other evidence of debt carries with it, or which has been agreed to be paid thereon. In case the greater rate of interest has been paid, the person by whom it has been paid, or his legal representatives, may recover back, in an action in the nature of an action of debt, twice the amount of the interest thus paid from the association taking or receiving the same: Provided, That such action is commenced within two years from the time the usurious transaction occurred."

### 3. The Agreement Here is Identical to the Agreement Declared Usurious and Voided in *Merchants Funding*

78.     This action's striking resemblance to Merchant Funding is not without merit. In that case, parties entered into a "merchant agreement" which purported to sell an interest in defendant debtor's accounts receivable/Factoring Agreement to lender. As the Agreement does here, the merchant agreement insisted that it was "not intended to be… a loan" and was conditioned upon Merchant's sale of products and services and the payment therefore by Merchant's customers. Attached hereto as **Exhibit A** is a copy of Merchants Funding's Agreement/Factoring Agreement.

79.     The merchant agreement, like the Agreement here, provided that in exchange for a "Principle Amount," a Factoring Rate  of the debtor's accounts receivable/Factoring Agreement  would be paid to the lender, through automatic ACH debits to an account set up to receive all of the debtor's receipts. *See* **Exhibit A**. The percentage was set at approx. 50% but

the agreement also calculated that these payments would amount to fixed daily withdrawals. The borrower was responsible for ensuring that the account was sufficiently funded to permit the daily withdrawal amount. The merchant agreement also gave the borrower the right to request adjustments to the daily withdrawal amount, but the granting of that request was at the sole discretion of the lender. *See* **Exhibit A**.

80.    As security for its repayment, the lender in Merchants Funding obtained two personal guaranties from the borrower's principals, making them "responsible for full payment, without contingency" of any obligation under the merchant agreement that the debtor could not meet, as well as affidavits of confession of judgment from those same principals. Merch. Funding, 55 Misc. 3d at 318, 322. When the debtor defaulted under the agreement, the lender filed the affidavits with the county clerk and obtained judgments by confession, which contained demands for attorneys' fees of 25% of the value of the judgment. Id. at 319.

81.    Similar to the agreement in Merchants Funding, the Agreement here also purports to offer a reconciliation provision, however, the lender is under no obligation to exercise such reconciliation and the debtor has no recourse in order to enforce such reconciliation each month. Further, a personal guarantee and signed confession of judgment was required of Falkowitz—eliminating any increased risk than that of an ordinary lender.

82.    In Merchants Funding, the Supreme Court of Westchester County held that the merchant agreement was a criminally usurious loan and void on its face. Merch. Funding, 55 Misc. 3d at 322. The Court looked to the following characteristics: a) although the lender had purported to purchase the debtor's future account receivables, the debtor produced evidence that the creditor never asked for the identity of the debtor's accounts receivable/Factoring Agreement  or of any of its customers; b) the lender failed to produce any evidence that it

intended to be an investor or partner in the debtor's business; c) the lender did not face a risk of loss of its principal greater than that provided by an ordinary lender; and d) the lender had required guarantees form the debtor's principals. Although the merchant agreement purported to permit withdrawal of a set percentage of the debtor's accounts receivable/Factoring Agreement , the court noted that the agreement actually authorized the lender to draw a fixed daily amount, which, when accounted for over the course of a year, amounted to an interest rate of 167%. As such, the agreement was found to be usurious.

83.    All of these facts and more are present in the instant case and have been aforementioned herein, weighing in favor of voiding the Agreement and the parties' obligations thereunder.

## **CONCLUSION**

84.    Within the four corners of the parties' Agreement at issue, it is unquestionably a loan at a criminally usurious rate of interest. This is a matter of contract interpretation so that there is no issue of fact and summary judgment is warranted.

85.    For all of the foregoing reasons, this Court should grant Plaintiffs' motion in its entirety and issue an Order:

      a)  Denying Defendants motion to compel arbitration.

      b)  granting Plaintiffs Motion to Remand; or in the alternative

      c)  granting Plaintiffs summary judgment on the issues herein pursuant to CPLR § 3212;

      d)  granting all claims and causes of action against Defendant and directing the clerk of the court to enter judgment accordingly; and

      e)  for such other and further relief as this Court may deem just and proper.

Dated:      Nyack, New York

September 25, 2019

Yours, etc.
LEVENSON LAW GROUP

*/s/ Scott Levenson*
By:  Scott Levenson, Esq.
Attorney for Plaintiff
9 North Mill Street
Nyack, NY  10960
(347) 352-2470
Levensonlawgroup@gmail.com